INSULAR DOCK COMPANY, Complt.,

*v.*

P. J. CARLIN CONSTRUCTION COMPANY AND SAN JUAN HARBOR BOARD, Dfts.

San Juan, Equity, No. 955.

INJUNCTION OF INJURY TO PIER.

Injunction—Relative Inconvenience.
    1. Although upon an application for a preliminary injunction

Insular Dock Co. v. P. J. Carlin Constr. Co.

the question of balance of convenience is of importance, it is entitled to much less weight on the final hearing where the legal right is more nearly paramount.

Injunction—Laches.

2.   Where water-front improvements, including the erection of a bulkhead and the widening of the marginal street, are instituted and bonds floated to pay therefor, the fact that suit is not brought to enjoin a violation of a property right caused thereby until the actual invasion of the plaintiff's property does not estop him from relief, since the injunction would merely result in an interruption in the continuity of the bulkhead and a construction in the street without rendering either utterly unavailable for use.

Laches—Protests *en Pais.*

3.   In general protests *en pais* against construction alleged to violate the plaintiff's rights do not preclude estoppel, and recourse must be had to the courts, but such protests show good faith and are of weight when followed by suit.

Injunction—Remedy at Law.

4.   Where the construction of a bulkhead would result illegally in the loss of the inshore end of the plaintiff's pier, the fact that the damage can be estimated in money and that the plaintiff has indicated it would accept the continuation of the pier at the outshore end at the defendant's cost does not prevent an injunction against the bulkhead upon the rejection of the proposition.

Opinion filed June 23, 1915.

———

Statement of Facts.

Many of the facts were put in evidence by affidavit on the hearing for preliminary injunction on May 6 and 10, 1915, and were proved by documents or witnesses upon the trial upon the merits.   The original statement may, therefore, be referred to as far as it goes.

The new evidence showed the development of wharfage facil-

FEDERAL REPORTS. 61

Insular Dock Co. v. P. J. Carlin Constr. Co.

ities at San Juan after the American occupation in 1899. Previous to that time there was a sea wall or stone bulkhead built by the Spanish government, extending from the Marina too far to the east of the site of the pier now in question. Until the present improvement was undertaken, this bulkhead remained in use. The main business of the place seems to have been transacted in front of the customhouse or aduana, at the foot of San Justo Street and along the water front, extending thence a few blocks eastwardly to the quartermaster dock. The first pier erected was that of the New York & Porto Rico Steamship Company, known as pier No. 1, but it was a private pier of that company, and not available for other purposes. Need for another pier was apparent, but nothing material was effected until the act of Congress of June 11, 1906 (34 Stat. at L. 234, chap. 3075), was passed allowing the Secretary of War to authorize piers and bulkheads. Mr. Carlos Conde Casariego took the lead in securing a new pier, and on August 30, 1906, secured from the Executive Council of Porto Rico an ordinance granting him the right to construct, maintain, and operate a pier on the harbor shore of San Juan. The power of the local authorities necessarily stopped at the shore, and so on November 28, 1906, he obtained a further right from the Secretary of War of the United States to build a pier 400 feet into the waters of the harbor. Mr. Conde interested merchants of San Juan in the enterprise, and the pier was constructed largely by public subscription. It cost about $218,000, and was several years in building. The evidence seems to show that it has been of great public benefit, in that, although now operated by the Insular Dock Company, it has always been open to public use in accordance with the terms of the franchise.

There was from an early date a difference of opinion between the local authorities and the United States engineers as to the proper location of the bulkhead line. The local government wished to extend the shore line further into the bay, and for the piers to begin at the new line. The government engineers did not consent to this. When pier No. 2 was building, this question was acute. There was a meeting of citizens and engineers on December 22, 1911, on the question of the new bulkhead line, but the War Department did not approve of any change. Mr. Conde was willing for his pier to begin at either point, but the decision of the United States engineers made it necessary for him to begin at the old bulkhead line.

The situation was somewhat changed when the local government obtained in their turn from the Secretary of War in 1912 under the same act the right to build a bulkhead some 40 feet further out, as they had planned in the beginning. The result is that they are now, through the San Juan Harbor Board, building the new bulkhead upon substantially the line which they originally contemplated, but long after pier No. 2 had been completed.

The evidence upon the trial shows that the new work is about 60 per cent completed, but that all the unused supplies for the contract were bought after the protest of July, 1914, written by the complainant to the San Juan Harbor Board. The water on each side of the pier at the present shore line is shallow, but can be used and is used for lightering. There is no door in the pier building at that point, however, by which goods can be laden to or from this 40 feet of comparatively shallow water. The first door in the pier building is further out than the contemplated new bulkhead line. The new bulkhead is shown to be

intended largely for the storage of freight, and not for actual use as a street; but the use of the present street will be facilitated by this improvement, because the goods now frequently piled up on the old bulkhead obstruct its use, and under the new arrangement the whole of the present street and more will be open for street traffic.

Much of the new testimony relates to planning and advertising for the new bulkhead, the issue of a half million dollars of bonds to construct it, as well as to the contract of the harbor board with the Carlin Construction Company. There was no evidence of opposition of any pier or landowner, except the Insular Dock Company to the extension of the bulkhead westwardly to the slip at the foot of San Justo street, as planned, and none that the improvement could not be profitably extended further eastwardly to San Antonio dock. Other facts material to the case are set out in the statement prefixed to the opinion of May 14, 1915, in this case, above referred to.

*Mr. H. G. Molina* solicitor for complainant.

*Mr. Howard L. Kern,* Attorney General, for the San Juan Harbor Board.

*Mr. Chas. Hartzell* solicitor for Carlin Construction Company.

HAMILTON, Judge, delivered the following opinion:

In this cause an injunction *pendente lite* was granted after hearing both sides, and since that time a trial has been had,

full evidence introduced for the complainant and the respond-
ent, and the result is that all the facts are before the court and
a final decision can be arrived at on the merits of the case.

1. This being on the final hearing, the question of relative
convenience in regard to an injunction has much less appli-
cation.   Whether work of the character in question should be
interrupted is a matter to be specially considered on the appli-
cation for a preliminary injunction.   That has already been set-
tled.   On the final hearing the question relates to the actual
rights involved.   These being ascertained, the injunction is dis-
solved or made permanent as a legal consequence.   In this view
of it, the fact that the congestion of the front street would be
relieved by the construction of the bulkhead is not controlling.
Doubtless a court will not grant an injunction which will do
more harm than good, for an injunction is to some extent a mat-
ter of grace rather than right.  Keeling v. Pittsburg, V. & C.
R. Co. 205 Pa. 31, 54 Atl. 485.   But here the plaintiff is de-
pendent on this remedy, while the public has yet another; and
the question of balance of present inconvenience does not con-
trol.   If the complainant has a legal right to the use of his pier
as it stands, it would not be material, outside of condemnation
proceedings, whether or not it would be better for the public to
have a wider street.   If the question of relative inconvenience
were to control upon a final hearing as at bar, a private indi-
vidual could never secure a permanent injunction at all.   The
interests of the public must always be greater in quantity than
those of an individual citizen.   But in a court of justice it is a
question not of quantity, but of quality; not of relative incon-
venience, but of positive legal right.

2. Stress has been laid in the argument upon the alleged

Insular Dock Co. v. P. J. Carlin Constr. Co.

laches of the complainant in permitting the work to go on, and a large bond issue placed, when he knew that the work would ultimately affect him; and it is argued that in such case he should have brought his suit at the beginning of the work. There are cases in which this would be true. A permitted change of circumstances may estop one from asserting rights. O'Brien v. Wheelock, 184 U. S. 450, 493, 46 L. ed. 636, 655, 22 Sup. Ct. Rep. 354; Abraham v. Ordway, 158 U. S. 416, 420, 39 L. ed. 1036, 1039, 15 Sup. Ct. Rep. 894; Penn Mut. L. Ins. Co. v. Austin, 168 U. S. 685, 698, 42 L. ed. 626, 631, 18 Sup. Ct. Rep. 223; Roberts v. Northern P. R. Co. 158 U. S. 1, 39 L. ed. 873, 15 Sup. Ct. Rep. 756; Cividanes v. Deford, 1 Porto Rico Fed. Rep. 97. This may apply to streets (Cowley v. Spokane, 99 Fed. 840), and to regrading a sidewalk, which if stopped would leave a dangerous place (Scharr v. Camden, — N. J. Eq. —, 49 Atl. 817). If continuity of the improvement is necessary to its use, it may well be that one must act at the beginning of the enterprise. To borrow an analogy from a large city, like New York, if a bridge is planned whose approach will pass over a great deal of private property, it could not be permitted that an owner of a 50-foot lot in the middle of the approach should stand by and see the work performed up to his line before taking action. A bridge is an example of a public work which has no value unless the whole of it is finished. It is a continuous public improvement somewhat as where a property owner lets an expensive freight depot be constructed before acting in opposition. Versteeg v. Wabash R. Co. 250 Mo. 61, 156 S. W. 689. This, however, is not necessarily so of all street improvements. It is true that a crowded street is to be measured by its narrowest part. An interruption of traffic at one point may cause more

VIII. Porto Rico—5.

public inconvenience than the narrowness of the thoroughfare for a considerable stretch. But a street, unlike a bridge, is used for local as well as through traffic. This would apply as well where the street has buildings on both sides, as where it has buildings on one side and shipping on the other. It cannot be said to be proved in this case that the interruption to the public is so great that the complainant should be held estopped because he did not bring his bill of complaint at the beginning of the work.

3. It is no doubt true that a mere complaint *en pais* is frequently not sufficient in law. The courts are the authorized means by which civil differences are adjusted, and complaints must be filed in court in order to be effectual. Smith v. Spencer, 81 N. J. Eq. 389, 87 Atl. 158; Mackall v. Casilear, 137 U. S. 556, 567, 34 L. ed. 776, 779, 11 Sup. Ct. Rep. 178; New York v. Pine, 185 U. S. 93, 46 L. ed. 820, 22 Sup. Ct. Rep. 592. The fact that complainant wrote a letter to the harbor board many months before the work reached his dock is, therefore, not conclusive. It has its value, however, as showing good faith in the exercise of his rights, when followed up, as it has been, by a legal proceeding.

4. It has been urged on the part of the harbor board that the injury to the plaintiff is one which can be covered by damages. The result of the proposed improvement will be to cut off say 40 feet from the inside end of the pier by turning it into a street or surrounding so much of his building by a highway, so that, if 40 feet is added at the other end, the damage will be repaired, and in fact the plaintiff may be better off than at present, because his pier will be in deeper water and the street approach improved. As the injury, therefore, can possibly be measured

in dollars and cents, it is argued that it is a case of damages, and not of injunction.

This, however, is not the law. In the view taken of the case by the court, a valuable franchise is threatened by the bulkhead improvement. Its substantial use will be impaired. A pier is something which is meant to be in continuous use, and stoppage by changing one end and building out another cannot be said to be a damage which is measurable in damages, except in the remote sense that every property injury, even the destruction of the whole pier, has a money value. The difference between an action for damages and a suit for injunction lies not so much in the amount, but the nature, of the injury. If it is a substantial impairment of the legal right, it may be enjoined without waiting for a complete stoppage of that right and bringing a suit for damages. The evidence shows that legal relief is inadequate. Lewis v. Cocks, 23 Wall. 466, 23 L. ed. 70. The fact that complainant is willing to have his pier lengthened at defendant's cost does not make this a question of damages. His willingness to accept the equivalent of condemnation damages does not waive his right to prevent practical condemnation without prepayment of damages. D. M. Osborne & Co. v. Missouri P. R. Co. 147 U. S. 248, 37 L. ed. 155, 13 Sup. Ct. Rep. 299.

5. It is further to be noticed that a suit for damages against the main defendant in this case would possibly not be productive. It is contended on both sides that the people of Porto Rico, or the harbor board acting for them, are a government, and not liable to suit. Much of the argument of the defense is based upon the high sovereign nature of the harbor board and its principal. This being so, the court would not feel obliged to remit the plaintiff to an action for damages, even if that would,

as between other parties, be the proper remedy. It is not questioned that the harbor board would only do what it thought for the public good, but it is confessed on all sides that the harbor board has only limited funds, which must be used in a certain way, which does not include the payment of damages. On the other hand, the Carlin Construction Company does not seem to be the real defendant in the case. It is the nominal actor, but has no interest except in earning its money by working for the harbor board. The facts would present a case more appropriate for prevention of an injury than for waiting until the injury is done and then seeking money damages.

6. It seemed proper to discuss the above points out of respect to the full argument had upon the merits; but it does not appear to the court that the facts proved on the trial make any substantial difference in the case as originally presented upon affidavits. The previous opinion of the court covers fully the main issues, and it seems only necessary to add what has been said above. In the previous opinion it was intimated that the right of the complainant might be in the nature of a franchise to be protected from impairment by subsequent grant. The argument on the merits confirms that view. The important cases of Philadelphia Co. v. Stimson, 223 U. S. 615, 56 L. ed. 570, 32 Sup. Ct. Rep. 340, and Greenleaf-Johnson Lumber Co. v. Garrison, 237 U. S. 251, 59 L. ed. 939, 35 Sup. Ct. Rep. 551 (April 12, 1915), are sufficiently discussed in that opinion. It does not seem that the case at bar comes within the principles they enunciate. On the contrary, it is now found, what was before stated only tentatively, that the complainant has, under the facts of the case, a franchise which in effect comes within the scope

of the Dartmouth College Case, and will be protected by all proper judicial means.

7. It is true, however, that the public authorities have, under the law, the right to widen the street at the point in question upon taking appropriate proceedings by condemnation or the like. D. M. Osborne & Co. v. Missouri P. R. Co. supra. It is not meant in any way to interfere with the exercise of this right. On the contrary, the solution of the difficulty which has arisen will probably be found in the exercise of this right. The principle of this case is unlike that of Kincaid v. Indianapolis Natural Gas Co. 124 Ind. 577, 8 L.R.A. 602, 19 Am. St. Rep. 113, 24 N. E. 1066; for here the public authorities interested as defendants have themselves enacted a means of widening the street as desired, and public policy requires that they should follow the law of their own creation, and pay adequate damages before doing. what amounts to condemning private property. (Act March 7, 1912, Laws of Porto Rico, p. 84, etc.) Whether the injury in question amounts to a taking or not would not seem to be essential to this case. The law creating the harbor board provides for the widening of the streets, of course upon paying the resulting damages to the property owners affected. It is not even clear that the defendant construction company cannot be employed at the other end of this harbor improvement, which, so far as the plans in evidence show, is not definitely connected with the next pier actually existing. At all events, if it is important to widen the street about pier No. 2, the resulting damages should be borne by the public, and not by the owners of that pier. Any other construction of the law would make the local government irresponsible, and enable it to act as it deemed best for the public good, leaving property owners affected to seek

a remedy at law, in which they would have to test the question of suability of the authorities. It would seem as if, in this case, the proverb as to prevention being better than cure may be adopted as a proper statement of law.

A decree will therefore be entered declaring the complainant entitled to relief, and restraining and enjoining the defendants, their agents, or representatives, from doing the acts complained of in the bill of complaint until the payment of proper compensation, to be ascertained according to law.

It is so ordered.